RECEIVED
FEB 2 5 2016
BY MAIL

FILED
FEB 2 5 2016
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI

Connie Raybourn, (DOC #1166670) )
)
    Plaintiff, )
)
v. ) **2:16CV00010 PLC**
)
Corizon Medical Services "CMS", ) Civil Action
Dr. Hari Kapur, former Med. Director, ) No.: _____
Dr. Justin Jones, current Med. Director, )
Dr. T.K. Bredeman, Assoc. Reg. Med. Dir., )
Dr. Carl Doerhoff, Surgicare of Missouri, )
Dr. William "Bill" Rice, WERDCC, )
Marilyn Hubert, Health Svcs. Admin., )
CO1 Susan Woodrow, MODOC, WERDCC, )
)
    Defendants. )

## COMPLAINT

### I. JURISDICTION & VENUE

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 and 1343 (a)(3). Plaintiff seeks declaratory and monetary relief pursuant to 28 U.S.C. Section 2201 and 2202. Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. Section 2283 & 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2. The United States District Court for the Eastern District of Missouri is an appropriate venue under 28 U.S.C. Section 1391 (b)(2) because it is where the events giving rise to this claim occurred.

### II. PLAINTIFF

3. Plaintiff, Connie Raybourn, is and was at all times mentioned herein a prisoner of the State of Missouri in the custody of the Missouri Department of Corrections. She is currently confined in the Women's Eastern Reception, Diagnostic and Correctional Center "WERDCC," in Vandalia, Missouri.

### III. DEFENDANTS

4. Defendant, Corizon Medical Services "CMS" is the contracted medical provider for the Missouri Department of Corrections, and is responsible for the policies and actions of its employees, both doctors and nurses, including outside "contracted" specialists. Corizon is legally responsible for the overall operation the medical department, and each institution under its jurisdiction, including WERDCC.

- 1 -

5. Defendant, Dr. Hari Kapur, is the former Medical Director (CMS) for WERDCC. He was legally responsible for the health and welfare of all the inmates of this prison, as well as the overall operation of the department and contracted specialists for CMS.

6. Defendant, Dr. Justin Jones, is Dr. Kapur's replacement. He is the new Medical Director (CMS) for WERDCC. He is legally responsible for the health and welfare of all the inmates of this prison, as well as the overall operation of the department and contracted specialist for CMS.

7. Defendant, Dr. T.K. Bredeman, is the CMS Associate Regional Medical Director. He is legally responsible for the health and welfare of all the inmates of this prison, as well as the overall operation of the department and contracted specialist for CMS. He is also responsible for a larger jurisdiction, a CMS region.

8. Defendant, Dr. Carl Doerhoff, is an "outside" general surgeon who is legally responsible for the welfare of the inmates he sees on a contractual basis with CMS. He is with Surgicare of Missouri.

9. Defendant, Dr. William "Bill" Rice, is legally responsible for the health and welfare of all the inmates of this prison, even though he is part-time at WERDCC.

10. Defendant, Marilyn Hubert, RN, CCHP, Health Services Administrator for CMS, is legally responsible for the health and welfare of all the inmates of this prison, as well as operational responsibilities including communications between staff, inmates and DOC officials.

11. Defendant, CO1 Susan Woodrow, is a Correctional Officer of the Missouri Department of Corrections who, at all times mentioned in this complaint, held the rank of CO1 and was assigned to WERDCC. She is legally responsible for the safety and security of all the inmates of this prison, including during transport.

12. Each defendant is sued individually and in his/her official capacity. At all times mentioned in this complaint each defendant acted under the color of state law.

IV. FACTS

### 13. DENIAL OF COLONOSCOPY.

See "Chronology" (Exhibit B). In April of 2012, Plaintiff turned 50. She asked Dr. Rice for a colonoscopy, pointing out a very large poster which still hangs on the wall near the med-take windows. It warns: "What do all these busy people have in common? They made time to get tested for colo-rectal cancer, so should you. If you are 50 or older, schedule your colonoscopy today." Plaintiff told Dr. Rice and Dr. Kapur on several different "chronic care" visits that she was experiencing bowel irregularities, including infrequent bowel movements and occasional blood in her stool. They both told her that this didn't warrant being tested, and they both attributed the blood to hemorrhoids.

In February 2014, Plaintiff was seriously ill and experiencing more chronic bowel irregularities, vomiting, weakness, weight loss and listlessness. She self-declared often and was told she was lazy and needed to walk more, drink more water, eat more fiber. Each time she was sent back without seeing the doctor. Nurses didn't believe her. (Exhibit M) On Feb. 18, she could no longer stand in the shower and bowels had not moved in weeks. Dr. Kapur was going to send her back to her housing unit when Dr. Jackie Springer intervened and ordered a single-view abdominal x-ray. She said it showed enlargement, and showed Dr. Kapur. He ordered no further x-rays or stool sample tests at that time. Eight days later Plaintiff was turning gray (Exhibit K). Her roommate relayed her concerns to her boss, who called her caseworker, Ms. Wilder, to check on her. Plaintiff was immediately put in a wheelchair and rushed to medical. This time an abdominal series x-ray was ordered and shows a blockage. She was taken to TCU, given magnesium citrate, and told to ride the stationary bike to get her bowels moving. She was also given an enema but nothing came out. She was taken in a wheelchair strapped down in the back of a van to the Audrain Medical Center. The next morning Dr. Joseph Corrado removed 5" of her colon and a cancerous tumor. He told her that it was slow-growing and had been there for nearly three years, it was Stage III. He scolded her for not having a colonoscopy when she turned 50, 22 months earlier. He said it would have been easily detected, had it been done.

Dr. Corrado ordered a colonoscopy and Corizon "CMS" failed to give Plaintiff the test until she again visited Dr. Corrado and he was shocked she still had not had one. The second time he ordered it it was given, sixteen months after the tumor had been cut out.

The tumor was cancerous so Plaintiff went through chemotherapy, a torn incision which caused a huge hernia, and mesh hernia repair. All because Dr. Kapur and Dr. Rice didn't act or order a colonoscopy, under CMS policy. The surgeon told Plaintiff she nearly died and he had used her case as a "cautionary tale" about having a colonoscopy. Nurse Johnmeyer attended his seminar and told her he stressed that the patient (Plaintiff) was near death.

CMS habitually inflicts injury, or ignores serious conditions, by maintaining unconstitutional policies, customs and practices that deny inmates, including Plaintiff, of medical testing and care, solely on the basis of costs and profit margins. (Exhibit E - bottom of page) Inmates at WERDCC completely understand why CMS was banned from practice in Illinois prisons.

This constitutes deliberate indifference to a serious medical need, as well as cruel and unusual punishment, violating Plaintiff's Eighth Amendment Rights.

14. CMS CONSPIRACY - CONTRACTED MEDICAL PROVIDERS

On March 6, 2014, Plaintiff's surgical incision in her abdomen split open about an inch while she was in TCU at WERDCC. This was soon after her surgery. Fluid drained all over the floor in a large pool. (Exhibit K) The hernia continued to tear open and nurses seemed unconcerned. (Exhibit E, bottom of page) Dr. Kapur refused to have it repaired, said it was unnecessary. On her follow-up appointment with the surgeon, Plaintiff was told that he would repair the torn sutures, by this time it was huge, 24cm. He said he'd have to cut her open again to repair the large hernia using the "open method" and that this would require a hospital stay. In September of 2015, Plaintiff was taken for hernia repair to a different surgeon, Dr. Carl Doerhoff, in Jefferson City. He told Plaintiff he was opting for a laparoscopic hernia repair. She woke up with 14 2-inch incisions all over her stomach and the surgery took 5-1/2 hours. She was told she was being transported back to WERDCC right then, an hour-and-a-half trip in the back of a car. When she expressed concern about no medical monitoring and not being kept overnight for observation, Dr. Doerhoff told her that, as part of his agreement (contract) with Corizon, he promised not to admit any of us [inmates]. Then he turned to transport officers, CO1 Goodwin and CO1 Collard and said "That's why they send me all of their business!"

Plaintiff was stuffed, barely conscious into the back of the car in an upright (bent) position, wearing six pounds of chains around her waist, cuffs on her wrists and ankles. The cuffs hit against an I.V. left in her wrist. She feared contamination. The waist chain cut into her recently incised abdomen, causing the Plaintiff to fear another rupture. She was driven over 100 miles back to camp.

Shortly after surgery, Plaintiff researched "open v. laparoscopic" incisional hernia repair surgery. (Exhibit D) The successful hernia repair is defined as being "tension-free." (Exhibit D, p. 5) Plaintiff's stomach resembles a potato with deep "eyes"/pits all over from the tension of the mesh implant. These are the anchor points and she suffers severe and chronic pain, sleep deprivation, a ripping/tearing sensation when she turns in certain ways, and it impedes/impairs daily activities. The research states that hernia repair for large (over 10cm) hernias shoud be done "open method" only. Her hernia measured 24cm, and she should never have been considered a candidate for laparoscopic repair.

On 11-2-15, Dr. Justin Jones, Medical Director at WERDCC, told Plaintiff that her post-operative complications were not serious and did not warrant a follow-up visit with the surgeon. He said that he observed her walk over and sit on his exam table just fine. When she argued that there was something seriously wrong and that the surgery had been botched, he told him she had a list of questions for the surgeon, like what kind of mesh had been used. (Exhibit C) She wanted to talk to the surgeon about why he had chosen the laparoscopic method when it was not advised to do so. Dr. Jones said he would allow her to write the surgeon and send him her questions, which she did. To date she has received no reply. Plaintiff requests an injunction for this matter.

Plaintiff suffers impaired quality of life and chronic pain and disfigurement. Dr. Jones told her "You don't see those pits in your stomach when you lie down", as if that should console her. She will require surgical revision in the near future, and will suffer irreparable injury absent issuance of a preliminary injunction.

Dr. Doerhoff and CMS conspired to provide a less than efficacious course of treatment to Plaintiff, in an effort to save CMS money. Dr. Doerhoff permitted CMS to exert control over the medical care he provided in order to "get all their business." He was and is influenced by CMS. Dr. Doerhoff contracted with CMS to provide general surgery to inmates incarcerated withing the Missouri Department of Corrections, including Plaintiff. By controlling and influencing contracted medical providers, CMS conspires to save money for owners and shareholders at inmate's expense. These "bought" contrated surgeons are not working in the best interest of inmates, but in the best interest of CMS. (Exhibit E, bottom of page)

There are systematic and gross deficiences in staffing, facilities, equipment and procedures/policies that deny the inmate population access to adequate medical care. A pattern of misconduct by medical staff appears to be encouraged by CMS officials.

Due to Plaintiff's colon cancer, chemotherapy and mesh implant hernia repair surgery, she will have to pay huge medical insurance premiums for the rest of her life. She's currently 53. Thirty more years of life could easily exceed $250,000 in health care premiums, not to mention the likelihood of further complications in the future. Mesh is notorious and seen in many TV advertisements for attorneys. CMS cares not about the long-term implications of second-rate healthcare. As long as they are able to protect their bottom line by spending as little as possible. Repair of the initial tear could have been done in early March, well before chemo began, May 13. This would have prevented the necessity of major hernia surgery.
CMS, Dr. Justin Jones and Dr. Carl Doerhoff violated my rights, under the Eigth Amendment.

## 15. GRANIX V. NEULASTA (WHITE BLOOD CELL GROWTH)

The large mass that completely blocked Plaintiff's colon was late Stage III colon cancer. Plaintiff had twelve chemotherapy sessions, one every two weeks, for six months. That was the plan. The protocol used was called "FOLFOX-6" and after her first chemo, her blood counts were too low for the next one. On June 3, 2014 she was given a shot of Neulasta, a white blood cell (WBC) grown stimulator, ordered by her oncologist, Dr. Shahid Waheed. Blood counts immediately improved and her next four treatments (two months) went smoothly and on schedule. Neulasta lasted over two months with only one shot, and kept blood counts steady. Low blood counts are life-threatening because even a common cold can kill you when your immune system is impaired. (Exhibit B, p.1)

Suddenly, Dr. Kapur told Plaintiff that CMS now considered Neulasta "non-formulary" and Granix would be substituted. He told her that it was basically the same drug except it required 5 to 7 injections instead of only one like the Neulasta. It is common knowledge here at WERDCC that the phrase "non-formulary" means it's too expensive and CMS won't pay for it. Inmates are often switched to much less efficacious, and much less expensive, medications. Granix was ineffective from the very beginning. After the first series of injections, Plaintiff missed numerous chemo sessions and suffered terrible pain at both the injection site in her stomach and from her bones aching for days. She had bleeding from all mucous membranes and blood counts so low or so high (improper dosage) that they were life-threatening. The nurses at the oncologist's office were often furious that counts were all over the place, and were unable to give me the chemo on schedule. To see the staff so distressed and visibly angry gave me frequent panic attacks. Dr. Waheed pushed for the Neulasta back, but CMS told him Granix was "the only option." Plaintiff discovered that was not true. (Exhibit I) Plaintiff's mother wrote CMS in Jefferson City and recieved a response from Jeri James, CMS Medical Contract Monitor. In it she states, "Marily Horn-Hubert reports if chemotherapy cycles are not possible due to the current plan, the alternate plan with Neulasta will be considered." In spite of continued ineffectiveness, this never happened. She also said "Per Ms. Horn-Hubert, HSA at WERDCC, Ms. Raybourn's completion of the scheduled Chemotherapy is based upon her laboratory values." CMS knew very well that Neulasta was the only drug that stabilized my lab values. They doggedly continued in a course of treatment that was known to be ineffective. Marily Horn-Hubert and Dr. Kapur both told her that Granix was the SAME drug as Neulasta, only a daily shot. That was not true. In Jeri James' letter she says "Originally, the drug Neulasta was recommended by the Specialist (Dr. Waheed). However, Granix was started because of its similar pharmaceutical actions to address low white blood cell counts due to chemotherapy." Not SAME but SIMILAR to Neulasta. Dr. Kapur and Marilyn Horn-Hubert kept promising to switch back if the Granix doesn't work this time. Over and over again they promised. It never happened. Treatment took nine months instead of six.

Plaintiff suffered emotional duress, pain, suffering, frustration at unnecessary delays in treatment, (Exhibits A-1 to A-6 and N). Dr. Kapur, CMS and Marilyn Horn-Hubert intentionally interfered with treatment, ignored an outside specialists orders and prolonged the treatment and suffering of Plaintiff.

Plaintiff believes her oncologist said it best when addressing the ongoing Granix/Neulasta controversy. He told her that he believed in the Golden Rule. He who has all the gold makes all the rules. Meaning, of course, CMS.

The inadequate, ineffective and untimely healthcare provided by Dr. Kapur and Marily Horn-Hubert seriously aggravated Plaintiff's condition and endangered her life on numerous occasions. CMS condones this policy of "outwaiting" helpless inmates until CMS has absolutely no other recourse but to use the "non-formulary" drug. This is done to ensure hefty profit margins for CMS owners and shareholders. (Exhibit I)

Plaintiff's Eighth Amendment rights were violated and she suffers permanent and debilitating mental duress and panic attacks when medical has to be seen.

16. FAILURE TO ACKNOWLEGE OR FOLLOW OUTSIDE SPECIALISTS ORDERS

During Plaintiff's chemo session, Kimberly, the oncology nurse, brought out a hat, scarf and gloves and told her she was to take them back to WERDCC for her use. Plaintiff said that, without a doctor's order, she was not allowed to have them. The orders were obtained and put in with the accessories, and handed to CO1 Woodrow, the DOC transportation officer. Plaintiff lost most of her hair and was suffering from extreme cold sensitivity and nerve pain from Oxaliplatin, a chemo drug (Exhibit J) Plaintiff already had a hat and gloves she had purchased at WERDCC, but they were very poor quality and so thin they were useless. The accessories given to her by the oncologist were thermal and good quality. During fire alarms, inmates are evacuated, often in the middle of the night, and kept out in freezing weather for over an hour. On the trip back to camp, CO1 Woodrow told her she didn't know why she took them because she wasn't going to be allowed to have them. CO1 Woodrow was supposed to take everything from outcount over to medical upon return. She didn't turn in the accessories and never said what she did with them. Therefore, medical was unaware that the doctor had ordered them until Plaintiff IRRd. Dr. Kapur said the accessories were unnecessary, even though other chemo patients had been able to keep theirs. Plaintiff was told the scarf was a strangulation risk, even though six-foot extension cords are sold here. Other inmates have scarves that are "grandfathered in" because they are no longer sold here.

CMS should have trained DOC officers, including CO1 Woodrow, that medical can provide IOC (Interoffice Communications) that override DOC policies when medically necessary. Regular toothbrushes

are considered dangerous contraband by DOC, yet Plaintiff was
issued one by medical. (Exhibit H) Dr. Kapur failed to follow
outside oncologist's orders. Special considerations and arrange-
ments were made for other chemo patients, one was allowed to take
a personal fan with her to visits.

Someone from WERDCC called Kimberly at the oncologist's office and
in her words, "chewed her out" for sending accessories back with
Plaintiff. CMS and Dr. Kapur should have issued an IOC permitting
the thermal accessories for her. Inhumane conditions were caused
by DOC's policy of labeling scarves as dangerous contraband.

Plaintiff believes CO1 Woodrow acted with cruel intentions. She
has harrassed Plaintiff in the past and has a reputation at WERDCC
for treating inmates in a harrassing and dehumanizing manner.
Upon info and belief, CO1 Woodrow once put dog food in an inmate's
pasta salad on the dog training wing. She still remains in the
employ of the Missouri Department of Corrections.

Denial of accessories ordered by doctor and exposure to freezing
temperatures with impaired resistance and insufficient covering
has resulted in permanent damage to nerve endings. Plaintiff's
gasping for air when exposed to cold caused psychological injury.
Her Eighth Amendment rights were violated by deliberate indiffer-
ence to serious medical needs and cruel and unusual punishment.

## 17. FAILURE TO TAKE REASONABLE MEASURES TO CONFIRM & ABATE RISK

Plaintiff was readied for a medical outcount for a chemo treatment.
She made the DOC officer, CO1 Woodrow, aware of her serious med-
ical condition, that she was taking Oxaliplatin (Exhibit J) and
it caused the inability to breathe when exposed to cold air. It
also caused extremely painful cold sensitivity in hands and feet.
The bank clock in town showed the temperature that day was only
one degree Farenheit, and the car had just been started. She
begged CO1 Woodrow to open the partition window to allow air to
circulate to the back where she could see her breath. CO1 Wood-
row refused, saying it was policy to keep it shut. There is a
"stop" on the window which prevents it from opening more than a
few inches. Plaintiff was chained around the waist and cuffed on
her wrists and ankles. Wrist cuffs are attached to the waist chain.
It is impossible to reach up to the window and the policy of keep-
ing the window closed has no valid security purpose. Keeping
the window closed is not reasonably related to the security of the
officer and constitutes unconstitutional punishment because its
overly restrictive and Plaintiff suffered inhumane conditions
because of this policy. Response to Plaintiff's IRR (Exhibit G)
states that CO1 Woodrow followed policy. The implementation of
this policy inflicted pain upon the Plaintiff. DOC official
policy appears to support circumstances where there are no
particular constraints on the COs decision-making process.
(Exhibits A-5 & A-6) CMS overrides DOC policy when medically
necessary. Leaving Plaintiff without warm air caused more in-
jury than discomfort alone, and resulted in the wanton infliction
of pain.

## 18. REMOVAL OF OVARIES ORDERED BY ONCOLOGIST

On 12-2-15 at 3:45 p.m., Ms. Miller, NP informed Plaintiff that she couldn't find any Waheed records and that the computer had been "switched over" in October. Ms. Miller accessed various screens, looking for oncologists (Dr. Waheed) orders to have her ovaries removed. She was concerned about their absence and told Plaintiff that she was going to have an "inservice" meeting about the missing records. It is Plaintiff's belief that these records have been intentially lost or destroyed because Dr. Waheed recommended, on several of her visits with him, that her ovaries be removed. She watched him write orders for this procedure. Her ovaries are cystic and he was concerned about the risk of ovarian cancer since she'd already had colon cancer. When Dr. Waheed heard from Plaintiff that she had been scheduled for laparascopic hernia surgery, his comment to her was: "but your ovaries haven't been removed yet. The mesh will make it very difficult to get to them. That should be done first." When Plaintiff spoke to Dr. T.K. Bredeman about ovarian removal, he said it "wasn't necessary." When Plaintiff insisted that Dr. Waheed deemed it important, Dr. Bredeman said he'd call (she assumed Dr. Waheed) and find out if it was necessary. The next visit she had with Dr. Bredeman, she asked if he'd spoken to Dr. Waheed. He stated he had not, but had called an expert who said it was not necessary. Plaintiff asked if the expert worked for Corizon and Dr. Bredeman said he did. Plaintiff sees a pattern here when it comes to improper record keeping. She beleives Dr. Bredeman used the opinion of an "Corizon-owned" specialist to give a differing (and inexpensive) counter opinion. Plaintiff insisted he call Dr. Waheed to find out why he said they had to come out. Plaintiff was called to see Dr. Jones. He said Dr. Bredeman spoke to Dr. Waheed and Dr. Waheed said he had never discussed removing my ovaries or made the order to do it. Plaintiff finds that very hard to believe but has no way to verify what she has been told.

Dr. Bredeman's assertion that the specialist that overrode Dr. Waheed knew best is another way CMS conspires to prevent further expenditures.

Plaintiff is likely to suffer future difficulties with her ovaries as relayed by her oncologist, Dr. Waheed. She continues to believe she is being lied to and that the records on the computer that would verify her belief have somehow been deleted. CMS and Dr. Bredeman are working together to keep costs down and elevate profits. It is general knowledge that CMS operates on a per capita rate and that every expensive treatment reduces the amount they can spend on other inmates.

WERDCC is CMS's "test location" for the new computer records system. It has now been launched at other locations.

## IV. EXHAUSTION OF LEGAL REMEDIES

Plaintiff, Connie Raybourn, used the prisoner grievance procedure available at WERDCC to try and solve the problems. Following are the dates the Plaintiff presented her facts for each of her six (6) grievances, and their tracking numbers at WERDCC:

| IRR Number | IRR Date | IRR Resp | Grievance Date | Grievance Resp | Griev Appeal | Griev Appeal Resp |
|---|---|---|---|---|---|---|
| 14-363 | 10-21-14 | 11-24-14 | 12-02-14 | 12-17-14 | 02-07-15 | 04-06-15 |
| 14-410 | 12-04-14 | 01-12-15 | 01-26-15 | 02-19-15 | 03-04-15 | 06-05-15 |
| 14-411 | 12-04-14 | 01-12-15 | 01-26-15 | 02-19-15 | 03-04-15 | 05-19-15 |
| 14-429 | 12-30-14 | 01-12-15 | 01-26-15 | 02-19-15 | 03-04-15 | 06-05-15 |
| 14-430 | 12-30-14 | 01-22-15 | 02-13-15 | 04-06-15 | 04-22-15 | 08-11-15 |
| 15-18 | 01-14-15 | 01-16-15 | 02-13-15 | 02-24-15 | 03-04-15 | 04-10-15 |

Plaintiff wishes to address concerns regarding the following grievances: See EXHIBITS A-1 through A-6)

Grievance 14-363. The Offender Grievance Appeal form was given to Plaintiff on 2-3-15 (see date in upper-right-hand corner) and she mailed it via her caseworker on 2-7-15, 4 days later, well within the seven-day established timeframe. See date of Plaintiff's signature on Grievance Appeal form.

Grievances 14,410, 14-411 and 14-429. Plaintiff contends that these are not "duplicates" because each addresses a different incident which establishes a pattern of ineffective treatment and documents the various ways Plaintiff suffered from continued use of the Granix instead of the Neulasta, which was effective. Plaintiff suffered a 50% increase in the time needed to complete chemotherapy, among many other side effects from the Granix. Plaintiff was started out on the Neulasta and it was highly effective. CMS doctors interrupted her already established and successful course of treatment and refused to administer Neulasta as per oncologist's orders.

Grievance 14-363. Plaintiff brings the issue of intentional interference with treatment and infliction of pain. Yes, Plaintiff concedes it concerns Granix, but the topic is different. This IRR is not a duplicate.

Connie Raybourn #1166670
WERDCC
1101 E Hwy 54
Vandalia MO 63382

## VI. LEGAL CLAIMS

Plaintiff realleges and incorporates by reference all issues brought forth in Section III. Facts.

The constitutional violations mentioned in each of the Section III. Facts violated plaintiff's rights and constituted cruel and unusual punishment, deliberate indifference to serious medical needs, conspiracy, etc. Plaintiff is a layman to the law and needs legal guidance from an attorney. She begs the court to appoint an attorney to assist her in determing what constitutional rights have been violated, as she is unable to determine how to complete this form with the proper format. Plaintiff was forced to rush this Complaint due to the statute of limitations. However, she was told that, because some issues are still unresolved (follow-up with hernia surgeon), that she may have an extension in which to file. The law library at WERDCC is sadly inadequate and Plaintiff is quite lost. She prays this court assign counsel.

The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparable injured by the conduct of the defendants unless this court grants the declaraty and injunctive relief which plaintiff seeks.

## VII. PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays that this court enter judgment granting plaintiffs:

A declaration that the acts and omissions described herein violated plaintiff's rights under the Constitution and laws of the United States.

A preliminary and permanent injunction ordering defendant, Dr. Justin Jones, to schedule a post-surgical follow-up visit with Dr. Carl Doerhoff, and an injunction ordering defendant, Dr. Carl Doerhoff to answer plaintiff's questions about her hernia repair surgery.

Compensatory damages in the amount of $ __100,000__ against each defendant, jointly and severally.

Punitive damages in the amount of $ __50,000__ against each defendant.

A jury trial on all issues triable by jury.

Plaintiff's costs in this suit.

Connie Raybourn #1166670
WERDCC
1101 E Hwy 54
Vandalia MO 63382

Any additional relief this court deems just, proper, and equitable.

Dated: February 21, 2016

Respectfully submitted,

*Connie Raybourn*
Connie Raybourn #1166670

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at WERDCC, Vandalia, Missouri on February 21, 2016

*Connie Raybourn*
Connie Raybourn #1166670

WHEREFORE, Petitioner moves this Court to grant her the relief she requests.

Dated: 2/21/16

Respectfully submitted,

*Connie Raybourn*
Connie Raybourn
WERDCC 1166670 2B 205
1101 E Hwy 54
Vandalia MO 63382

## CERTIFICATE OF SERVICE

This certifies that I have, on this 21st day of February, 2016, placed a true and exact copy of the

42 U.S.C. 1983 Action

in the U.S. mail first-class postage, prepaid to:

Gregory "Greg" Linhares
Clerk of Court
United States District Court for the
Eastern District of Missouri
Thomas F Eagleton U.S. Courthouse
111 South Tenth Street, Room 3.300
St. Louis, Missouri 63102